In Re: M. J. S., County of Butler, Appellant.

Argued March 14, 1984, before Judges WILLIAMS, JR., DOYLE and BLATT, sitting as a panel of three.

*Alexander H. Lindsay,* with him, *William C. Robinson* and *Kenneth D. Perkins, Henninger & Robinson,* for appellant.

*Martha Z. Zatezalo, Buchanan Ingersoll Professional Corporation,* for appellee.

OPINION BY JUDGE DOYLE, August 1, 1984:

This is an appeal by the County of Butler from the decision of the Butler County Court of Common Pleas which ordered that M. J. S. remain a patient at the Elwyn Institute, and that the County continue funding for her treatment.

M. J. S. (Patient) is a severely mentally retarded adult who suffers from Down's Syndrome. Since 1957 she has resided at the Elwyn Institute, a private residential facility for the mentally retarded in Delaware County, Pennsylvania. Funding for the Patient's treatment was provided directly by the Commonwealth's Department of Public Welfare (DPW) until 1981, when DPW directed the counties to administer the state funds through their Mental Health/Mental Retardation Program. At that time, Butler County, the Patient's county of residence, assumed funding and began monitoring the Patient's progress at Elwyn through its Base Service Unit.[1] After two visits to the facility and a review of its reports, the County concluded that the Patient could reside in a less institu-

[1] The Base Service Unit consists of multidisciplinary professional and nonprofessional staff provided by the county to plan, direct, and coordinate appropriate services for persons who are mentally retarded and in need of service from the county program. Section 6201.12(a) of the Mental Retardation Manual, 55 Pa. Code §6201.12(a).

tionalized setting, and began arranging for her transfer to a community living arrangement in Butler County. When the Patient's guardian, Robert Stock, refused to consent to the transfer, the County advised him that funding for the Patient's continued placement at Elwyn would be terminated.

In response to Robert Stock's demand for a hearing, the County petitioned the Court of Common Pleas under Section 406 of the Mental Health and Mental Retardation Act of 1966[2] (Act), and a hearing was held on the issue of whether the County could properly terminate funding. On April 27, 1983, the Court issued an opinion and order in which it concluded that a transfer to the Community Living Arrangement would not be in the best interest of the Patient, and ordered that the County continue funding of the Patient's treatment at Elwyn Institute.

On appeal to this Court, the County contends that the trial court erred in overruling its decision, arguing that it should be accorded wide discretion in determining the proper placement of patients under its supervision, and in allocating its funds accordingly. The County's authority for this proposition is found in Section 6201.12(b) of the Mental Retardation Manual[3] (Manual), which states, in pertinent part:

. (b)   The Base Service Unit is responsible for performing the following functions in such a way as to carry out the following objectives of the county program:

. . . .

------

[2] Act of October 20, 1966, Special Sess., No. 3, P.L. 96, *as amended*, 50 P.S. §4406, repealed in part by Section 502 of the Mental Health Procedures Act, Act of July 9, 1976, P.L. 817, *as amended*, 50 P.S. §7502. Although this Section specifies procedure for court commitment of mentally retarded persons, the County stipulated that no commitment was being sought; and that the Petition was filed for the sole purpose of obtaining a hearing date from the court.

[3] 55 Pa. Code §6201.12(b).

(9) Ensure that services will not be authorized for funding by the county program unless they are consistent with the life-management plan as developed by the Base Service Unit and approved by the county administrator.

(10) Provide for comprehensive diagnosis and evaluation services to do all of the following:

. . . .

(iii) Develop a practical life-management plan for individuals and their families and provide the necessary counseling and follow-along services.

The County argues that it was well within its authority under this provision when its Base Service Unit developed a Life Management Plan which provided for a transfer to a Community Living Arrangement, and then required that funding be made consistent with that plan.

While it may be true that the County has the authority to develop and implement the Patient's Life Management Plan, a further reading of the applicable law indicates that the County's discretion in this matter is somewhat more limited than the County would suggest. In addition to those provisions already cited, Section 6201.12(b) of the Manual also states that in developing the Patient's Life Management Plan, the County's Base Service Unit must involve the participation of other individuals, such as the Patient's family, physician, and providers of service.[4] Thus, the

---

4 Under Section 6201.12(b)(3) of the Manual, the Base Service Unit is required to

[m]aintain a continuing relationship with the mentally retarded person and with any facility or provider of ser-

County is required to seek the advice of the current provider, here the Elwyn Institute, before reaching a decision as to whether a transfer is appropriate.

In the present case the officials at Elwyn Institute neither recommended nor requested that the Patient be transferred. On the contrary, the Patient's most recent Individual Habilitation Plan, developed by an interdisciplinary team at Elwyn pursuant to the requirements of Section 6400.124 of the Manual,[5] recommended continued placement at the facility. This recommendation was in agreement with the opinion of the staff psychologist, who reported that the Patient's success was due to her overlearned routine, and that any changes in her environment would create difficulties in adjustment. Further, these recommendations were supported by evidence before the trial court which indicated that the Patient was a sensitive individual who did not make friends easily, and did not herself wish to be transferred. Additional evidence also indicated that the Patient had lived at Elwyn for over twenty-five years and had responded well to a

---

vice responsible for service to the mentally retarded person during any stage of his life-management process.

In addition, Section 6201.12(b)(5) of the Manual, 55 Pa. Code §6201.12(b)(5) requires that the Base Service Unit

[i]nitiate, develop, and maintain a pattern of interaction between the diagnostic and evaluation team and others concerned with services to any mentally retarded person and his family. This pattern must emphasize participation in the life-management planning process of such persons as the family, physician . . . other providers of service, advocates, and the mentally retarded person, whenever possible.

[5] Section 640.124 of the Manual, 55 Pa. Code §6400.124 requires that an Individual Habilitation Plan be compiled for each Patient on an annual basis, with periodic revisions every three months. The plan is to include evaluation of the patient's skill level, short term objectives, time frame for completion, and methods to be used in evaluation.

secure and supportive environment, which included visits from her brother who lived nearby.[6]

Despite these well-supported recommendations, the County attempts to justify its unilateral decision to transfer the Patient by reference to its policy of pursuing the least restrictive setting for mentally retarded patients.[7] While pursuing the less restrictive setting of a Community Living Arrangement is a laudable goal, it does not justify the County's actions in ignoring the recommendations of the Elwyn Institute when developing the Life Management Plan, nor in failing to seek their concurrence in the proposed transfer.

While nothing in the applicable law *requires* a county to adopt every recommendation of a provider, such law does indicate a clear intention that those most familiar with the Patient's case have at least some voice in determining placement decisions regarding the Patient. Therefore, in situations such as this, where the record is clear that the County has completely disregarded the recommendations of those

---

[6] The Patient and her brother entered Elwyn together but her brother was able to leave Elwyn aftr ten years. He lives on his own in the area and visits his sister with some frequency. Although the Patient visits remaining family members in Butler County on vacations, she is afraid of the Community Living Arrangement and referred to the group home as a "jail house" in her own interview with the trial judge.

[7] In support of its policy, the County erroneously relies upon Section 102 of the Mental Health Procedures Act (MHPA), Act of July 9, 1976, P.L. 817, *as amended*, 50 P.S. §7102. That section indicates that the MHPA does not apply to a person who, like the Patient here, is mentally retarded but not mentally ill.

We note, however, that a similar policy statement appears in Section 6201.1(a) of the Mental Retardation Manual, 55 Pa. Code §6201.1(a), which states that the county program is to "ensure for every mentally retarded person and his family the right to live a life as close as possible to that which is typical for the general population."

familiar with the case, the County has overstepped its authority and is guilty of an abuse of discretion.

In view of this abuse of discretion, the Court of Common Pleas has correctly concluded that the County erred in determining that the Patient should be transferred to the Community Living Arrangement, and properly ordered continued funding for the placement at Elwyn Institute. Accordingly, we affirm the order of the Butler County Court of Common Pleas.

ORDER

Now, August 1, 1984, the decision and order of the Butler County Court of Common Pleas in the above referenced matter, Ms. D. 82-133, dated April 27, 1983, is hereby affirmed.